# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 15, 2005 Session

## STATE OF TENNESSEE v. JAMES RIELS

### Direct Appeal from the Criminal Court for Shelby County
### No. 03-06530 Chris Craft, Judge

### No. W2004-02832-CCA-R3-DD  - Filed March 31, 2006

The appellant, James Riels, appeals his sentences of death imposed by a Shelby County Criminal Court jury.  On September 18, 2003, a Shelby County Grand Jury charged the appellant with one count of first degree felony murder for the death of Mary Jane Cruchon, one count of first degree premeditated murder for the death of Mary Jane Cruchon, one count of first degree felony murder for the death of Franchion Pollack, one count of first degree premeditated murder for the death of Franchion Pollack, one count of especially aggravated robbery of Franchion Pollack, one count of attempted especially aggravated robbery of Mary Jane Cruchon, and one count of aggravated burglary of the habitation of Mary Jane Cruchon.  On August 9, 2004, the appellant entered guilty pleas to all seven counts.  The trial court merged the felony murder convictions with the premeditated murder convictions, resulting in two convictions for first degree murder.  A jury was impaneled for the sentencing phase, and on August 13, 2004, the jury imposed the death penalty for the murder of each victim.  In the death of Mary Jane Cruchon, the jury unanimously found the presence of three statutory aggravating circumstances.  In the death of Franchion Pollack, the jury unanimously found the presence of four statutory aggravating circumstances. The jury further determined that the aggravating circumstances outweighed any mitigating circumstances.  The trial court approved the sentencing verdict.  In a separate sentencing hearing, the trial court imposed an effective thirty-five-year sentence for the remaining noncapital convictions.  The appellant appeals, presenting for our review the following issues: (1) whether the trial court erred by overruling his motion to suppress, (2) whether the trial court erred by permitting the State to cross-examine him regarding the circumstances of the offenses, (3) whether the trial court erred by permitting the introduction of a post-mortem photograph of one of the victims, (4) whether the trial court's instruction that the appellant's prior offenses were offenses whose statutory elements involved the use of violence violated the United States Constitution, (5) whether the trial court's instruction on victim impact evidence constituted a coercive jury instruction, and (6) whether Tennessee's death penalty scheme is unconstitutional.  Finding no errors requiring reversal, we affirm the appellant's sentences of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and J.C. MCLIN, JJ., joined.

Tony N. Brayton, Garland Erguden, and Robert Wilson Jones (on appeal) and Larry Nance and LaTonya Burrow (at trial), Memphis, Tennessee, for the appellant, James Riels.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; William L. Gibbons, District Attorney General; and Gerald Harris and Michelle Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The appellant entered guilty pleas to all four counts of first degree murder, and the trial court merged the convictions into two counts of first degree murder.  Thereafter, a jury was impaneled, and the penalty phase of the trial began, during which the jury imposed a sentence of death for each murder conviction.  The trial court later ordered that these two sentences be served consecutively.  The appellant also pled guilty to the remaining charges of especially aggravated robbery of Franchion Pollack, attempted especially aggravated robbery of Mary Jane Cruchon, and aggravated burglary of the habitation of Mary Jane Cruchon.  The appellant does not challenge the sentences imposed for the noncapital convictions in this appeal.

A.  Evidence at the Penalty Phase

Nadine Cruchon testified that in April 2003, her fifty-nine-year-old sister, Mary Jane Cruchon, resided at 3818 Shirlwood in the High Point Terrace area of Memphis.  Eighty-nine-year-old Franchion Pollack lived next door at 3810 Shirlwood.  The two neighbors were extremely close.  Mary Jane Cruchon was a registered nurse and took care of her neighbors when they needed help.  Pollack lived alone, and Cruchon would take her to doctor appointments and invite her over to eat.  When Pollack fell and broke her shoulder, Cruchon became even more of a caretaker to Pollack.

Over Easter weekend, Nadine Cruchon visited another sister in New Orleans and returned to Memphis the Tuesday evening after Easter.  Upon arriving in Memphis, Nadine heard on the radio that there had been a shooting in the High Point Terrace area.  Concerned for her sister and Franchion Pollack, Nadine went to their houses on Shirlwood and was met by newspaper reporters

and policemen. The entrances to the homes were roped off by the police, and an officer informed Nadine that Pollack was at The Med in serious condition. Nadine's sister was dead. Nadine went to The Med and visited with Pollack, who was unconscious.

Nadine Cruchon testified that her sister's death was devastating to her as well as to the rest of her siblings. She explained that she had a brother, David, who lived in Bartlett, and two sisters, one in New Orleans and one in San Diego. Nadine stated that she "felt like that [she] actually wanted to die [her]self." She was very close to her sister, and she never imagined that she "would have to go through something like this."

Officer Kenneth Calhoun of the Memphis Police Department testified that on April 22, 2003, he and his partner responded to a report that someone was hurt in front of a home on Shirlwood. When they arrived, Steven Mead, who identified himself as a handyman working at the home, told them that he had discovered some people in the home. The officers went inside and found two females "laying down in blood." Officer Calhoun noticed that the older victim was still alive and called for emergency help.

Officer Gerald Page testified that he photographed the crime scene. When he arrived, Pollack had been removed from the home. In performing his duties, Officer Page noticed that a television appeared to be missing from a television stand. He also saw bloodstains surrounding Cruchon's body and bloodstains in a bathroom, the west bedroom, the north bedroom, the foyer, and the living room.

Memphis Police Officer Timothy Sims testified that he was the case coordinator for the incidents occurring on Shirlwood. As a result of his investigation, Officer Sims talked with each employee of the contracting company that had been working on Pollack's residence. This included the appellant.

On April 24, 2003, the appellant arrived at the homicide office accompanied by his mother. Officer Sims observed that the appellant appeared "normal" and did not appear to be under the influence of any drugs or alcohol. Officer Sims interviewed the appellant but did not read him his rights because the appellant was not under arrest at that time. During the interview, Officer Sims learned that the appellant had been working at Pollack's home and had been there several times. The appellant related that he had been working at the home on April 21 when his equipment broke down. The appellant stated that he left the residence, went home, changed clothes, picked up a female, went looking for crack cocaine, and then returned to Pollack's home later in the day. The appellant's statements made Officer Sims suspicious. As a result, Officer Sims asked for permission to search the appellant's home, and the appellant consented to the search. Officer Sims left the police department and went to the appellant's home, which he shared with his mother. The appellant's mother led Officer Sims to a garbage can in the driveway that contained the clothing the appellant

had been wearing on the evening of April 21, 2003. Officer Sims saw what appeared to be blood on the pair of brown boots, the pair of blue jeans, and the blue shirt contained in the garbage can. Officer Sims returned to the police department and advised the appellant of his rights.

The appellant voluntarily gave a statement to officers in which he admitted killing the victims. The appellant stated that he knew both women because he was working on Pollack's residence. On the evening of Monday, April 21, 2003, the appellant returned to Pollack's home in a red Ford F-150 pickup truck owned by his employer, Allen Johnson. The appellant had a claw hammer in the truck with him. The appellant described the events of April 21, 2003, as follows:

> I got there about 8:00 a.m. Monday morning and proceeded to unload my tools and work on the house. I worked on the house all day until 4:00 p.m. About 10:00 or 10:30, my spray rig broke down so I went to lunch and went to look for a part for it . . . . I did not find the part. I went back to the house and continued to clean up my equipment . . . and then left the house and proceeded to my boss's house, Allen Johnson, where I dropped off some equipment.

> I then proceeded to drive around looking for someone who could direct me to find some cocaine. I found someone and we bought some cocaine and we got high. We did that until I ran out of money, which was about 6:30 or 7:00 p.m. I then dropped that person off and proceeded to drive around to think up some way to get some more money. I made my way over to Fran's house. I went in Fran's house and tried to con them out of some money. When they wouldn't give me any money I got aggravated and went out to my truck and got the hammer. I went back in the house and walked Mary Jane into the hallway and proceeded to hit her in the head with the hammer. I continued beating her with the hammer in the face until she was not moving any more.

> Then, I went in to the kitchen and got Fran, walked her into the hallway and hit her in the head with the hammer until she fell to the ground. And I hit her again until she wouldn't move.

-4-

I then searched through the house for money where I found some change and put it in my pocket. Then I went next door to Mary Jane's house where I first looked for money and didn't find any. So I went back over to Fran's house and took her TV out of the house and put it in the back of my truck.

I then left and . . . picked up a female who could show me where to sell the TV for some cocaine. . . . I was paid in dope for the TV. . . . I proceeded to drive around and get high.

When that was gone I found another female that I knew . . . and picked her up and drove around to prostitute. I picked her back up after she would date and we would go get some dope and ride around and get high. We drove around . . . until about Tuesday afternoon, about 2:00 or 2:30, or broke down at Amoco at Macon and Sycamore View. . . . She continued to work to support our drug habit. We did that continuously until about 8:00 or 9:00, Tuesday night.

The appellant stated that the claw hammer was in a dumpster behind the T.J. Maxx store off Summer Avenue. The appellant explained that he had "conned" Cruchon and Pollack into "letting [him] leave some tools there so that they would let me in the house." He further explained that he used a ruse involving painting errors to get Cruchon into the hallway and that he hit her with the hammer seven or eight times. He then lured Pollack into the hallway by telling her that Cruchon had had an accident. The appellant said he killed Cruchon's dog with the hammer because the dog was "barking real loud." The appellant stated that Cruchon's home was unlocked and that he searched her bedroom, dresser drawers, purse, and living room.

Through the testimony of Temiika Gipson, a clerk for the Shelby County Criminal Court Clerk's Office, the State introduced the appellant's prior convictions into evidence. The clerk's files indicated that the appellant had been charged with and pled guilty in case number 97-09215 to aggravated robbery. Gipson read the following indictment to the jury:

The grand jurors of the State of Tennessee . . . present that James C. Riels, on May 12, 1997 in Shelby County, Tennessee . . . did unlawfully, knowingly and violently by use of a deadly weapon, to-

-5-

wit; a knife, obtain from the person of Laura White, a sum of money, proper goods and chattels of Laura White, in violation of Tennessee code annotated 39-13-402 . . . .

The appellant had been charged with and pled guilty in case number 97-09216 to aggravated robbery. Gipson read the following indictment to the jury:

The grand jurors of the State of Tennessee . . . present that James C. Riels, on April 15, 1997 in Shelby County, Tennessee . . . did unlawfully, knowingly and violently by use of a deadly weapon, to-wit; a pistol, obtain from the person of Margie Martinson, a sum of money, proper goods and chattels of Margie Martinson, in violation of Tennessee code annotated 39-13-402 . . . .

The appellant also had been charged with and pled guilty in case number 97-09217 to aggravated robbery. Gipson read the following indictment to the jury:

The grand jurors of the State of Tennessee . . . present that James C. Riels, on March 26, 1995 in Shelby County, Tennessee . . . did unlawfully, knowingly and violently by use of a deadly weapon, to-wit; a shotgun, obtain from the person of James Son, a sum of money, proper goods and chattels of James Son, in violation of Tennessee code annotated 39-13-402 . . . .

Dr. O.C. Smith testified that in April 2003, he was the acting medical examiner for Shelby County and performed Cruchon's autopsy. Dr. Smith observed recent bruising to the victim's left knee, upper shoulder area, the back of her hands, and her left cheek. Two of the victim's fingers on her right hand were fractured, indicating that they had been crushed by some impacting object. Dr. Smith commented that the injuries to the victim's hands were consistent with the defensive act of protecting one's head. He also noticed that there were "tears in the scalp or the forehead leading down on either side of the nose." Dr. Smith opined that these tears "may have been produced by the claw end of the hammer . . . it would mark the skin and go into the bone and cause fractures of the face." The wounds also indicated "separate blows to the skin of the forehead. . . . [T]here were extensive fractures produced in this area, of the left brow." A laceration of the skin in this area "resulted in like dent, or a pressure mark on the top surface of the skull." Another blow similarly caused the skin to tear open and marked the skull with a small dent into the bone. Dr. Smith counted a total of fourteen blows, including five blows to the front of the skull; two superficial blows to the left cheek and temple; three blows to the right side of the skull, two marking the bone and one tearing the scalp; and four blows to the top of the skull. One blow resulted in a fairly extensive fracture and damaged the brain.

In examining Cruchon's body, Dr. Smith saw bruising to the tongue, indicating that the tongue may have been trapped between the teeth. He also noticed blood in the top of the throat, indicating that blood from the facial injuries entered the mouth and went down the windpipe. Dr. Smith stated that the blood that went down the windpipe went into the lungs, indicating that Cruchon continued to breathe for some time after the injuries were inflicted. The victim also swallowed about six ounces of blood, which was discovered in her stomach. He concluded, however, that she did not live long enough to have any inflammatory response to the injuries. Dr. Smith testified that he was unable to determine the sequence in which the wounds were received.

As to the cause of Cruchon's death, Dr. Smith made the following remarks:

> Obviously the more extensive injuries, the fracture of the skull and to the brain can certainly cause death. But additionally, by virtue of the amount of energy that a hammer can bring into the body, even if it doesn't fracture the skull, the blow itself may cause some injury to the brain which may not kill as quickly. But, if the brain starts to swell on [its] own, even in the absence of tearing or bleeding about the brain, brain swelling can result in serious head injury and if it's not treated it can result in death. But, in this instance with the damage to the brain that was done, especially in the area of the left forehead, that damage to the brain could certainly result in her death.

Dr. Smith also conducted Pollack's autopsy and found significant injuries to the back of her head. The victim's cerebellum, which controls balance and coordination, had been damaged. This damage was the result of a severe blow to an area behind the left ear, causing fragments of bone to enter the brain. Dr. Smith opined that Pollack had received two blows to the head, which were consistent with being struck with a hammer. Comparing the wounds of the two victims, Dr. Smith was able to conclude that the victims' injuries were received at the same time, although Pollack's wounds were in the healing process. Dr. Smith determined that the cause of Pollack's death was "blunt trauma to the head and again the manner is homicide."

On cross-examination, Dr. Smith conceded that he was unable to determine the sequence of the blows as to either victim and that it was possible the first blow to either could have rendered that victim unconscious. Dr. Smith stated that he could not determine if either victim was conscious or unconscious during the blows. Notwithstanding, he stated that Cruchon did have defensive wounds to her hands, indicating that she was anticipating something.

In mitigation, the appellant first presented the testimony of Dr. Murray Smith, a specialist in addiction medicine. Dr. Smith testified that he had been working exclusively in the area of addiction medicine since 1990. Dr. Smith qualified his specialization, noting that the certification

did not come from the American Medical Association (AMA) as addiction medicine is not recognized by the AMA. Rather, his specialization was granted by the American Board of Specialties through other persons specializing in addiction medicine.

Dr. Smith explained that sixteen percent of the population, or one out of every six persons, is born with a brain chemistry that causes them to become addicted. Based upon this brain chemistry, the person cannot control use of the substance, and "[t]hey become a slave to that substance." The person with this brain chemistry cannot stop using the substance even though the substance is causing trouble in the person's life.

In the instant case, Dr. Smith reviewed the appellant's prior hospital records and interviewed the appellant about his childhood and chemical dependency. Based upon his examination of the appellant, Dr. Smith concluded that "[the appellant] met all of the diagnostic criteria for chemical dependency." The first chemical used by the appellant was nicotine. The appellant began smoking cigarettes at age fifteen and "from that point on they became a focus of him getting and using them." Dr. Smith said, "At age twenty he had that same reaction to his first use of crack cocaine. It became the focus of his life." He stated that the appellant had to get money for cocaine and committed some illegal activities to get the drug. He stated that when the appellant was not using chemical substances, he was "a calm, peaceful human being." Cocaine provided a source of energy and pleasure. Dr. Smith stated that the effects of smoking crack cocaine go to the brain in a matter of seconds and last about fifteen or twenty minutes. During that time, the user feels like "Superman." When the feeling subsides, the user is left with the feeling that he has to repeat the dose, and "the desire to repeat that dose means that anything that gets in their way of getting that dose is their enemy." Dr. Smith described crack cocaine as "one of the most powerfully addictive substances we know." He further acknowledged that crack cocaine addiction is the most difficult to treat. Dr. Smith related that he was aware that the appellant had sought treatment for his addiction in 1996. Treatment proved unsuccessful on several attempts, and the appellant attempted suicide. The appellant was not treated for depression at that time. The appellant informed Dr. Smith that he was treated on three occasions for his chemical dependency to cocaine.

The appellant's father, James Webber Riels, testified that he married the appellant's mother when he was a senior in high school. Sherry Riels Gibson, his ex-wife, had graduated from high school the previous year. The couple divorced after one and one-half years of marriage when the appellant was about eighteen months old. Mr. Riels had custody of the appellant some weekends, although no regular schedule was established. Mr. Riels was employed by the railroad at the time and frequently worked out of town. Two years after the divorce, Mr. Riels remarried. He reported that his new wife got along "okay" with the appellant. However, as the appellant grew older, there was "a lot of arguing" between his second wife and the appellant.

Mr. Riels and his new wife had two children of their own. He took his family on vacation, including a trip to Disney World. The appellant was not included on this trip because the appellant's

mother felt that it would be too hard to take him out of school and because Mr. Riels' second wife did not want to take the appellant with them. When he was about twenty years old, the appellant relayed his disappointment in not being included in this vacation to his father.

Mr. Riels was aware of his son's cocaine addiction and stated that the addiction "has made him a total different person." He testified that the addiction had "practically ruined [his son's] life, as far as he's been in trouble and in and out of drug rehab." Mr. Riels related that he had been aware of the appellant's addiction since the appellant was nineteen. He was also aware that the appellant had sought help for his addiction problem. Mr. Riels had taken his son to two different addiction treatment centers, and the appellant's mother had taken him to one or two centers.

On cross-examination, Mr. Riels admitted that he had always supported the appellant financially and emotionally. He always provided child support, he assisted the appellant in getting addiction treatment, and he employed his son when he needed a job. Despite this help, the appellant continued to make bad life decisions. Mr. Riels stated that if the appellant were executed "[i]t would be stabbing me in the heart. That's my son. It would be like a part of me died. I still love him no matter what."

Marta Riels, the appellant's stepmother, testified that she and James Webber Riels had been married for one and one-half years. She stated that she had formed a strong bond with the appellant and that she loved him as if he were her own son. She stated that if the appellant were sent to prison, she would continue to visit him and write him letters. She opined that if the appellant were sentenced to death, "[i]t would be devastating. It would be like [losing] a son.

The appellant's aunt, Linda Gray, testified that she lived in Hot Springs, Arkansas, that the appellant was like a son to her, and that she had been very supportive of him his entire life. She expressed her love for the appellant and stated that she would continue to support him if he were sent to prison. Gray described the appellant's relationship with his father as distant until the appellant was ten years old. Today, the father and son had a better relationship. Gray related that James Riels' second wife did not like the appellant because he was "the other child."

Richard Gibson, the appellant's stepfather, testified that he married the appellant's mother when the appellant was seven years old. Gibson described the relationship between mother and child as "[a] bond that's unbelievable. They both sense when something's wrong with each other. He and his mom were very, very, very close." Gibson stated that the appellant enjoyed a similar relationship with James Webber Riels. He stated that he had always treated the appellant like his own son. The appellant was included as part of the family on a daily basis and was included in all family activities. He testified that he would be very deeply affected if the jury imposed the death penalty.

Teresa League, the appellant's aunt, testified that she lived with the appellant and his mother when the appellant was young and that the appellant got along very well with her children. As a child, the appellant liked to play Batman and Superman. League stated that she remembered when the appellant began having problems. Throughout his problems, the entire family, including herself, remained very supportive. She stated that she loved the appellant as a son and that she could not imagine life without him.

Sherry Gibson, the appellant's mother, testified that she and the appellant's father divorced when the appellant was two and one-half years old. She met her present husband in 1980, and they married in 1989. During the time period between her divorce from the appellant's father and her marriage to Richard Gibson, the only male figure in the appellant's life was his father. She stated that he visited with his father about seven or eight times per year.

Sherry Gibson testified that the first signs of the appellant's addiction surfaced when the appellant was eighteen or nineteen years old. At that time, she noticed that the appellant's behavior changed and that he would run out of money shortly after being paid. The appellant told his father that he had a problem with drugs and that he wanted help. The appellant asked his mother for help also, and both parents assisted the appellant in getting treatment. Gibson stated that treatment was sought for her son on at least three occasions. Specifically, the appellant went to the Memphis Recovery Center, Harbor House, and Serenity House. She stated that she attended meetings with her son at Harbor House and that the treatment programs "worked for a while." She had tried to understand how drugs could dominate a person's life, but she could not understand why the urge to use drugs returned.

The appellant's mother identified numerous documents. Records from Harbor House reflected a treatment period in June 1995 and the appellant's participation in a twelve-step rehabilitation program. The appellant's tenth grade report card and an English paper describing his expectations for himself were also introduced. Gibson identified numerous poems authored by the appellant, including one that was published in a book. She related that her son not only wrote poetry well but was also a talented artist and that she would continue to support him. In trying to describe the impact of a sentence of death, she stated, "I'm praying that it doesn't make me die at the same time, because he is part of me and I don't want to be without him."

The thirty-year-old appellant testified as the defense's final witness and acknowledged that he had accepted responsibility for the crimes. He stated that when he was young, his relationship with his father was "a little distant." He would occasionally spend the weekend with his father and sometimes would spend an entire week with his father. The appellant attributed the distance in their relationship to his father's second wife and his children with her. This relationship changed a few years ago, when father and son attempted to establish a better relationship with one another. The appellant stated that he loved his father.

The appellant testified that his relationship with his father's second wife was "[n]ot very good at all." He felt that he was accused of things he did not do and that there were times when he was not treated the same as his half-brother and half-sister. Specifically, the appellant recalled that he was excluded from a trip to Disney World. He blamed his exclusion on his stepmother, and these feelings were transferred to his father. He felt that his father should have stood up for him. As to other familial relationships, the appellant testified that he was very close to his Aunt Teresa and his Aunt Linda. He recalled fond childhood memories of them and stated that he was very close to his mother. The appellant testified that "I feel like I have a connection with her that I don't have with anybody else."

The appellant related that his mother married Richard Gibson, and they all lived together. He stated that his stepfather had two sons. He described the family as "average, normal." When the appellant was fifteen years old, he began smoking cigarettes. He later tried other substances, including alcohol, marijuana, and cocaine. The appellant frequently used cocaine and classified himself as an addict.

Regarding his cocaine addiction, the appellant described the physical symptoms of his addiction, including getting "butterflies in [his] stomach" and vomiting before he knew he was going to get high. He stated that he would have urges where he felt that he had to have the cocaine. He described having these urges for the past ten years. The appellant stated that to stop these urges, he sought treatment on three occasions. He was in a thirty-day program at Harbor House in 1995. Although he completed this program, he began using cocaine again. The appellant acknowledged having three prior convictions for aggravated robbery and one conviction for forgery.

On cross-examination, the appellant testified that at the time of the crimes, he was under the influence of cocaine and vodka and "wasn't in my right frame of mind." Notwithstanding, he was able to drive to Pollack's home for the purpose of conning the victims out of some money. When his plan did not work, he went out to the truck, concealed the claw hammer in his pants, and returned to the house. The appellant admitted that Cruchon was a barrier to him getting any money from Pollack and that he and Cruchon got into an argument. During his argument with Cruchon, the appellant hit her in the back of the head with the hammer when she was not looking. After she fell to the floor, the appellant continued to hit her with the hammer. Despite the victim's moaning, the appellant continued to beat her. Within a couple of hours of the crimes, the appellant was having sexual intercourse with Tammy Stafford.

The appellant stated that he had used cocaine and alcohol together previously and that he had been aware, for the most part, of how he would react to their effects. He explained,

> Alcohol pretty much it makes you drunk and it makes you,
> when you drink excessive amounts of it, it may at times blur your

-11-

vision, or you may feel too relaxed about things. Whereas cocaine brings you up and makes you feel like Superman at times. And when the two mix, the cocaine pretty much outweighs the alcohol, but it's a feeling that's hard to explain when the two are mixed.

The appellant admitted that his family was very supportive and that he had a good job earning twelve dollars per hour and using his employer's truck. He blamed the murders on his addiction to cocaine and his desire for more of it. The appellant expressed remorse to the victims' families and stated, "If I could take it all back, I would."

## B. Jury Instructions

At the conclusion of proof, both parties stipulated that the average life expectancy of a male in Tennessee was seventy-nine point eight three years. The trial court then instructed the jury as to the following statutory aggravating circumstances:

As to Mary Jane Cruchon, only[:]

(1)     The defendant was previously convicted of one, or more felonies other than the present charge. The statutory elements of which involve the use of violence to the person.

The state is relying upon the crime of aggravated robbery which is a felony. The statutory elements of which involve the use of violence to the person.

2)     The murder was especially heinous, atrocious, or cruel, in that it involved torture, or serious physical abuse beyond that necessary to produce death.

3)     The murder was knowingly committed, solicited, directed or aided by the defendant while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing, or attempting to commit any robbery.

As to Franchion Pollack, only:

-12-

(1)     The defendant was previously convicted of one, or more felonies other than the present charge.  The statutory elements of which involve the use of violence to the person.

The state is relying upon the crime of aggravated robbery which is a felony.  The statutory elements of which involve the use of violence to the person.

2)     The murder was especially heinous, atrocious, or cruel, in that it involved torture, or serious physical abuse beyond that necessary to produce death.

3)     The murder was knowingly committed, solicited, directed or aided by the defendant while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing, or attempting to commit any robbery.

4)     The victim of the murder was seventy years of age, or older.

The court provided the following definitions:

Heinous means grossly wicked or reprehensible, abominable, odious, vile.

Atrocious means extremely evil, or cruel, monstrous, exceptionally bad, abominable.

Cruel means disposed to inflict pain or suffering, causing suffering, painful.

Torture means the infliction of severe physical, or mental pain upon the victim while he or she remains alive, or conscious.

The court then provided instructions on the following mitigating factors:

1) The murder was committed while the defendant was under the influence of extreme mental, or emotional disturbance.

2) The youth or advanced age of the defendant at the time of the crime.

3) The capacity of the defendant to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law, was substantially impaired as a result of intoxication, which was insufficient to establish a defense to the crime, but which substantially affected his judgment.

4) The defendant has a family [whose] members have expressed love and support.

5) The defendant's family have expressed that they will likely be supportive of him during incarceration.

6) Any absence of the defendant's father as he grew to adulthood.

7) The defendant's capacity to be productive.

8) The fact that a death sentence may have a significant impact on the relationship of the defendant with his family.

9) The defendant's completion of the eleventh grade at Kingsbury.

10) That the defendant was gainfully employed at the time of his arrest through Allen Johnson, a contractor.

11) The defendant's continued addiction to [crack] cocaine.

12) The defendant's peaceful and appropriate behavior, apart from the use of alcohol and cocaine.

13) The fact that the defendant did not receive treatment for his depression.

14) The defendant's repeated attempts to get help for his drug addiction.

15) The defendant's taking responsibility for his acts by admitting his guilt to the charges.

16) Any other mitigating factor which was raised by the evidence produced by either the prosecution, or defense at the sentencing hearing.

### C. Jury's Verdict

Following submission of the instructions, the jury retired at 8:40 a.m. to consider the verdicts. At 12:15 p.m., the jury returned its verdicts, finding that the State had proven beyond a reasonable doubt the three aggravating circumstances charged regarding Cruchon's murder and the four aggravating circumstances charged regarding Pollack's murder. The jury further found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. In accordance with their verdict, the jury imposed sentences of death.

## II. Analysis

### A. Suppression of Statement to Police

Before trial, the appellant filed a motion to suppress his statement to law enforcement officers and all evidence seized as a result of the search of his home. In support of the motion, the appellant asserted that (1) he was arrested without probable cause, and (2) the consent to search his home was not knowingly made because he was under the influence of cocaine at the time. A hearing on the motion to suppress was held on December 18, 2003, during which the following proof was presented:

Sergeant James Fitzpatrick testified that on April 22, 2003, he went to a home at 3810 Shirlwood in the Highland/Walnut Grove area of Memphis. Upon arriving at the scene, he discovered one homicide victim, Mary Jane Cruchon, and one victim, Franchion Pollack, who was still alive. Pollack was transported to The Med for treatment but later died of her injuries. Sergeant Fitzpatrick acknowledged that this was "a fairly violent and fairly bloody homicide" and that a dog also had been killed. Sergeant Fitzpatrick stated that there were no suspects. He observed, however, that there were no signs of forcible entry to the home and that the house was in the process of being remodeled. The general contractor was Allen Johnson, and law enforcement began questioning all of Johnson's employees who had worked on the residence. Officer Timothy Sims obtained the names of Johnson's employees. Law enforcement was aware that the last vehicle seen at the residence was a red Ford F-150 pickup truck with ladders or ladder racks.

Sergeant Fitzpatrick testified that on April 24, 2003, at approximately 3:00 p.m., the appellant and his mother arrived at the Memphis Police Department Homicide Office. The appellant was calm and cooperative, and Sergeant Fitzpatrick saw no indication that the appellant was under the influence of any drugs or alcohol. At that point, the appellant was neither a suspect nor was he under arrest, and he was not handcuffed or shackled. The appellant provided Sergeant Fitzpatrick with an account of his activities on April 21, 2003, beginning with his having gone to Pollack's home. He related that he worked there until a piece of equipment broke down. He spent the next hours unsuccessfully looking for a replacement part, cleaning his equipment, and completing some work that he was directed to do by Cruchon. The appellant then left the residence and went home to change clothes. He reported that he returned to Pollack's home "to leave a ladder and then he said

-15-

to pick up a ladder, and ultimately he left some . . . paint at the house before leaving and going to find a friend." The appellant stated that he had left three gallons of paint near the patio door. Sergeant Fitzpatrick testified that this statement raised concern because the patio doors were open when officers arrived at the scene, and there was no paint observed at the house. This statement, however, did not elevate the appellant to a suspect, "but it did ring a bell . . . to look at him a little closer." The appellant also confirmed to officers that he was in possession of a red Ford F-150 pickup, which was a work truck owned by Allen Johnson. The appellant further related that when he left Pollack's house, he went to find an acquaintance, Tammy Stafford, to try to get some cocaine. Officers questioned Stafford about 4:30 p.m. Her account of the events on April 21 were inconsistent with the appellant's statement.

In light of the information provided by Stafford, law enforcement officers asked the appellant if he would consent to a search of his mother's house, his place of residence. The appellant replied "that he had no problem with that, and he signed the records of document giving us consent to search his . . . quarters within his mom's home." The appellant did not have any questions about the consent to search form and signed the form about 4:30 p.m. Officer Sims and another officer then went to the appellant's mother's home, where she signed a consent to search the entire premises. While the officers were conducting the search, the appellant remained in an interview room at the police department. He was not handcuffed, and Sergeant Fitzpatrick stated that he would "stick [his] head in from time to time." He maintained that the appellant was not a suspect at that time and that other information was being checked.

At 7:45 p.m., Officer Sims notified Sergeant Fitzpatrick that he had found blood-spattered work clothes and work boots at the appellant's residence. Sergeant Fitzpatrick informed the appellant that he was under arrest and shackled him. Specifically, Sergeant Fitzpatrick put a shackle "on his ankle, shackled him to one of the chairs in the interview room." The appellant did not request an attorney and did not ask any questions about his legal rights. The appellant was then left in the interview room.

The officers returned from the appellant's residence and consulted with Sergeant Fitzpatrick. The appellant was informed of the evidence discovered at his residence and was advised of his legal rights. The appellant indicated that he wanted to give a statement. Officers took him from the interview room to the general Homicide Office, a transcriptionist was obtained, and the appellant signed an advice of rights form at 8:50 p.m. The appellant gave a seven-page statement immediately thereafter, admitting his involvement in the crimes. He signed and approved the statement at 10:45 p.m.

Sergeant Fitzpatrick described the appellant as "somewhat remorseful" while giving his confession. The appellant was not very talkative but responded to questions. The appellant did not appear to be under the influence of cocaine. Sergeant Fitzpatrick remarked that the appellant appeared to be "quite familiar with the Advice of Rights." At no time did the appellant request an

attorney.  The appellant never inquired as to his legal rights and never indicated that he did not want to talk to the officers.  During the period between 4:30 p.m. and 7:30 p.m., the appellant was basically left alone in the interview room.  At some point, another officer asked if the appellant wanted anything to eat or drink.  Sergeant Fitzpatrick admitted that the interview room was locked and that the appellant could not leave the room without knocking on the door.  Sergeant Fitzpatrick stated that the appellant never asked to leave, but he could not answer whether the appellant would have felt that he was not free to leave prior to his actual arrest at 7:30 p.m.

Officer Timothy Sims testified that he spoke with Allen Johnson and that Johnson told him the appellant had been driving a red pickup truck.  Officers knew that a red pickup could have been the last vehicle seen at Pollack's home.  When the appellant and his mother came to the police department, they appeared happy to help the police officers with anything they needed in the case.  Neither of them requested a lawyer, and Officer Sims observed that the appellant was smiling.  Officer Sims and Sergeant Fitzpatrick interviewed the appellant briefly "to find out if he had seen anything unusual at the address on Shirlwood."  Officer Sims told the appellant that he wanted to see the clothes that the appellant had been wearing on the day of the crimes, and the appellant signed a consent to search form.  Officer Sims and another officer went to the appellant's home and informed his mother that they were looking for the clothes worn by the appellant on Tuesday, April 22.  Ms. Gibson informed the officers that the appellant had "put some boots and some jeans in the garbage can."  Ms. Gibson went to a garbage can located in the driveway and retrieved a "plastic bag with some boots and a pair of jeans, and inside she ripped it open."  The items appeared to have blood on them.

Officer Sims returned to the police department, told the appellant that he was under arrest, and read the appellant an advice of rights form.  He had the appellant read the form back to him, and the appellant appeared to understand his rights.  Officer Sims and Sergeant Fitzpatrick interviewed the appellant, and the appellant admitted to the crimes.  While the appellant was giving his statement, the statement was being typed.  After his interview, the appellant reviewed the written statement, made corrections, and signed it.  He never requested an attorney, appeared to have a good memory, and did not appear to be under the influence of any drugs.

At the conclusion of proof, the trial court made the following findings of fact and conclusions of law:

> Okay.  Well, looking at -- we have three issues here.  First two, I think, are immediately resolvable.  The . . . Defense is trying to suppress the written statement, the arrest of the defendant and any products from it, and the property that was seized at the house of the mother or his house where he was living.

Find from the facts that the property at the house was taken pursuant to a Consent To Search signed by him voluntarily, a Consent To Search signed by his mother voluntarily, and also that she turned those items over to the police as a lay person so that there are no -- this was not an unconstitutional seizure [or] search of his property.

His arrest was only made after probable cause was found when Officer Sims found the suspected bloody clothing, along with everything else, called Officer Fitzpatrick and he placed the defendant under arrest. At that point they had probable cause to arrest him and it was only at that point that he was shackled, ankle shackled to his chair.

So I find the arrest was lawful and not unconstitutional. It was not an unconstitutional seizure of his person.

As far as the statement's concerned the question is going to be whether or not Miranda was violated, whether or not he was -- it was a custodial interrogation prior to the time the statement was taken. His statement was not taken until he was read his rights and so there's not a problem with the statement itself unless it was a fruit of a poison tree.

In other words unless the information given by the suspect in his interview was given unconstitutionally and which then led to other investigation, talking to the prostitute, talking about the clothes, seizing his property which then made the seizure the fruit of the poisonous tree as it were.

Looking at whether or not he was in custody during the preliminary interview I'm just going to put a couple of cases on the record. . . . **State** **vs.** **Anderson** . . . the relevant inquiry in determining whether an individual's in custody . . . is whether under the totality of the circumstances a reasonable person in the suspect's position would consider himself . . . deprived of freedom of movement to a degree associated with a formal arrest.

. . . .

-18-

And in this case the defendant voluntarily went down to the station house with his mother. Even if it were proved, and there is no proof that she forced him to go to the house as his mother, that still would not be State action.

But she brought him down there, he was not handcuffed, the door was open, closed, open, closed all during the day. He never asked to leave, was never handcuffed until after he was formally arrested.

The information that he gave the police during this interview was . . . general stuff, general investigative questions . . . .

Under those circumstances the proof that I have here I don't find that he was -- that he would have felt that he was not free to leave . . . .

[H]e was not in custody, and because of that any interview that the police took of him, along with all the other witnesses, was not in custodial interrogation and there was nothing about that interview that was unconstitutional so that any fruit from that interview would lead to a Mirandized confession which would be fruit of the poisonous tree.

The appellant contends that the trial court erred by overruling his motion to suppress his consent to search his home and his alleged statement. In support of his motion to suppress, he argues that law enforcement officers violated his constitutional rights against unreasonable seizure and his privilege against self-incrimination.

This case involves a review of the trial court's findings of fact and conclusions of law in denying a motion to suppress evidence. Because issues of whether a defendant was placed in custody, interrogated, and voluntarily gave a confession are primarily issues of fact, we review these factual determinations by the trial court according to the standard set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Under the Odom standard, an appellate court will not disturb the facts found by the trial court unless the evidence preponderates against the lower court's findings. Id. (citing Odom, 928 S.W.2d at 23). "Questions about witness credibility and 'resolution of conflicts in the evidence are matters entrusted to the trial judge.'" Id. (quoting Odom, 928 S.W.2d at 23). Moreover, the "[t]estimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress." State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). Notwithstanding this

deference to the trial court's findings of fact, our review of a trial court's application of law to the facts is conducted under a de novo standard of review. Walton, 41 S.W.3d at 81; State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

## 1. Custody

In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These procedural safeguards require that police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. State v. Sawyer, 156 S.W.3d 531, 533 (Tenn. 2005). If these warnings are not given, statements elicited from the individual may not be admitted in the prosecution's case-in-chief. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994). A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).

Miranda warnings are required when a person is subject to custodial interrogation by law enforcement. See Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. "Custodial" means that the subject of questioning is in "custody or otherwise deprived of his freedom by the authorities in any significant way." Id. at 478, 86 S. Ct. at 1630. Our supreme court has expanded this definition of custodial to mean "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). This test is "objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question." Id. In determining whether a reasonable person would consider himself or herself in custody, we review a variety of factors, including

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the

suspect is made aware that he or she is free to refrain from answering
questions or to end the interview at will.

Id.

Because this was a motion to suppress, we must accredit the trial court's findings of fact. The trial court accredited the testimony of the law enforcement officers, and the evidence in the record does not preponderate otherwise. When we apply the Anderson factors to the facts testified to at the suppression hearing, we determine that the appellant was not in custody under the totality of the circumstances. The appellant's initial presence at the Memphis Police Department Homicide Office on April 24 was for the purpose of gathering facts in the investigation of Cruchon's murder and Pollack's assault. The police contacted the appellant at approximately 10:00 a.m. that morning, but the appellant did not arrive at the police department until 3:00 p.m. that afternoon. The appellant's mother accompanied him to the police department, and although the appellant was placed in an interview room, the record does not reflect that he was deprived of his freedom of action in any significant way. Specifically, there is no indication that the appellant was prevented from leaving the interview room, and the appellant was left unattended in the room for large amounts of time. The interactions between the officers and the appellant were cooperative and cordial. The officers testified that the appellant was calm, cooperative, and smiling and that the appellant was not under arrest at that time.

The testimony at the suppression hearing revealed that the appellant became a suspect when Officer Sims discovered the appellant's bloody clothing. Officer Sims contacted Sergeant Fitzpatrick, and Fitzpatrick immediately arrested the appellant. When Officer Sims returned to the police department, he advised the appellant of his Miranda rights. The record reflects that the appellant did not request a lawyer and made incriminating statements after he was advised of his rights and waived those rights. We conclude the trial court did not err by denying the appellant's motion to suppress his statement.

2. Consent to Search

"A warrantless search is presumed unreasonable under both the federal and the state constitutions, and evidence seized from the warrantless search is subject to suppression unless the State demonstrates by a preponderance of the evidence that the search was 'conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Chearis, 995 S.W.2d 641, 643 (Tenn. Crim. App. 1999) (quoting State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998)). Two exceptions to the warrant requirement include a search incident to arrest and a search conducted pursuant to consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973).

"[T]o pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992). The question of whether the appellant voluntarily consented to the search is a question of fact which focuses upon the totality of the circumstances. Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2048. The pertinent question is whether the defendant's act of consenting is "'the product of an essentially free and unconstrained choice.'" Id. at 225, 93 S. Ct. at 2047 (quoting Culombe v. Connecticut, 367 U.S. 568, 602, 81 S. Ct. 1860, 1879 (1961)). If the defendant's "'will was overborne and his capacity for self-determination critically impaired,'" due process is offended. Id. at 225-26, 93 S. Ct. at 2047 (quoting Culombe, 367 U.S. at 602, 81 S. Ct. at 1879). The following factors are used to evaluate the voluntariness of the consent: (1) whether the defendant is in custody; (2) the length of detention prior to the giving of consent; (3) the presence of coercive police procedures; (4) the defendant's awareness of the right to refuse to consent; (5) the defendant's age, education, and intelligence; (6) whether the defendant understands his constitutional rights; (7) the extent of the defendant's prior experience with law enforcement; and (8) whether the defendant was injured, intoxicated, or in ill health. See, e.g., State v. Carter, 16 S.W.3d 762, 769 (Tenn. 2000).

Knowledge of the right to refuse consent has also been included as a factor. Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2048. Moreover, the State must show "more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 549, 88 S. Ct. 1788, 1792 (1968). The burden of proof rests upon the State to show, by a preponderance of the evidence, that the consent to a warrantless search was given freely and voluntarily. Id. at 548; 88 S. Ct. at 1792. "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." Florida v. Bostick, 501 U.S. 429, 439, 111 S. Ct. 2382, 2389 (1991); Schneckloth, 412 U.S. at 243, 93 S. Ct. at 2056 (holding that "there is nothing constitutionally suspect in a person's voluntarily allowing a search").

Using the factors applicable to the present case, we examine the totality of the circumstances by first considering the appellant's personal characteristics. The appellant was twenty-eight years old at the time of the crimes. While the record is silent as to his intelligence, the record indicates that he had an eleventh grade education. The officers testified that the appellant did not appear to be intoxicated or under the influence of any substance and that the appellant was calm and cooperative. The record shows that the appellant had a prior history of arrests at the time his consent was given. This fact demonstrates a presumptive familiarity with the criminal justice system.

The appellant also signed the consent to search form. The consent form provided that the appellant was advised of his right to refuse to consent to the search. The appellant's consent was given to the search of his premises at "4659 Wicklow," where he lived with his mother, Sherry Gibson, and she also signed a consent to search form. The consent to search form provided that Ms. Gibson was advised of her right to refuse to consent to the search. At the residence, officers informed Ms. Gibson that they were looking for the clothing worn by the appellant on Tuesday, April 22. Ms. Gibson voluntarily went to the garbage can located in the driveway, retrieved a garbage bag from the garbage can, and gave the bag and its contents to the officers. The appellant and his mother

had a common possessory interest in the property to be searched, and either could grant valid consent to search the property. See State v. Bartram, 925 S.W.2d 227, 230-31 (Tenn. 1996). "'Voluntary consent requires sufficient intelligence to appreciate the act as well as the consequence of the act agreed to.'" (Thurman v. State, 455 S.W.2d 177, 180 (1970) (quoting 79 C.J.S. Searches and Seizures § 62(b)). Nothing in the record contradicts the trial court's finding that the appellant voluntarily gave consent. We conclude that under the facts of this case, the appellant knowingly, intelligently, and voluntarily consented to the search of the premises at 4659 Wicklow. Similarly, the evidence demonstrates that Sherry Gibson's consent also was voluntary. Finally, no constitutional violation is apparent from the fact that the appellant's mother, at a time when the appellant was still living at her home, supplied police officers with the appellant's clothing. No search was involved, and the evidence supports a conclusion that the mother's cooperation was voluntary. The clothing was located in a garbage can in the driveway, an area clearly under Ms. Gibson's control and not within the exclusive control of the appellant. The search and the fruits thereof withstand constitutional scrutiny. The appellant is not entitled to relief on this issue.

## B. Cross-examination of the Appellant

Before the appellant took the stand in his own defense, the trial court made several rulings regarding his cross-examination. Specifically, the trial court ruled that if the appellant testified regarding his drug addiction, then the State would be permitted to cross-examine him about the circumstances of the offenses. The trial court also stated that the State could cross-examine the appellant about the circumstances of the offenses if the appellant "got on the stand and started saying residual doubt, or I really didn't know what I was doing." The court said that "obviously, the state could then get into it. I just want to make sure that's clear to everybody."

During the appellant's testimony, the following exchange occurred between the appellant and his attorney:

> Q. Is there anything that you would like to say to the family and/or friends of Ms. Pollack and Ms. Cruchon?
>
> A. Yes.
>
> Q. You may say it at this time.
>
> A. I'd like to say that I'm sorry for their loss. I didn't mean for any of this to happen. I didn't want to hurt anybody. If I could take it all back, I would. And I'd like to say to their family members and their friends that I am truly sorry for

-23-

what I did. If there was ever anything that I could do, I would do it, but I don't know that there is. I would like to apologize for what I did. They didn't deserve any of this and there's no excuse for what I did. That's all I have to say about that.

[Defense]:     Nothing further, Your Honor.

The trial court asked the attorneys to approach the bench and stated, "The statements that he made, 'I didn't mean for it to happen, I didn't want to hurt anybody', flies in the face of facts in the confession." The defense argued that the appellant simply had been expressing remorse. However, the court announced that the appellant had opened the door for the State to question him about the circumstances of the offenses. The appellant's direct testimony resumed, and the appellant testified about his drug addiction. On cross-examination, the State questioned the appellant extensively about his beating the victims and compelled the appellant to physically demonstrate how be bent over Cruchon while he hit her with the hammer. The appellant complains that this cross-examination was extremely prejudicial and requires a new sentencing hearing.

In State v. Cazes, 875 S.W.2d 253, 266 (Tenn. 1994), our supreme court addressed the scope of a defendant's cross-examination at a capital sentencing hearing and announced the following rule:

> We thus conclude that, only in the limited sphere of a death penalty sentencing hearing, a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does not operate as a complete waiver of the privilege against self-incrimination. Accordingly, a defendant has a right to limited cross-examination if he or she wishes to testify about only collateral mitigating circumstances at the penalty phase of a capital trial. We reiterate, however, that even in such special situations, a defendant may be completely and thoroughly cross-examined about all testimony given or fairly raised by that defendant on direct examination.

(Citations omitted.) We note that during the first part of the appellant's direct testimony, he testified only about his personal history, particularly his strained relationship with his father and his close relationship with his mother. The appellant then expressed his remorse for the crimes, and the defense told the trial court that it was finished questioning the appellant. It was only after the trial court announced that the appellant had opened the door to cross-examination by the State as to the circumstances of the offenses that the appellant testified about his drug addiction.

We disagree with the trial court's concluding that the appellant opened the door to cross-examination about the circumstances of the offenses. In our view, the appellant's statements were simply his attempt at expressing remorse to the victim's families and friends about the crimes he had already admitted committing. More troubling, however, is the trial court's calling the parties to the bench and sua sponte announcing that the appellant had opened the door. At that time, the State had not argued that the appellant opened the door, and it may have never raised the issue. In any event, we believe the trial court's improper conduct did not prejudice the appellant. Although the State's cross-examination of the appellant elicited graphic details about his beating the victims and compelled him to demonstrate how he bent over Cruchon as he struck her, the jury had heard the appellant's statement in which he described beating the victims with the hammer. Moreover, the jury heard graphic testimony from Dr. O.C. Smith concerning the victims' injuries and saw photographs of Cruchon and the crime scene. In light of this evidence, we conclude that the trial court's ruling that the appellant opened the door to cross-examination about the circumstances of the offenses was harmless error. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## C. Photograph of Victim

Next, the appellant claims that the trial court improperly admitted a photograph of Mary Jane Cruchon into evidence. The photograph, exhibit 9, shows a bloodied Cruchon lying in the hallway with blood spatter on the walls and her clothes. The photograph was taken from the angle of the victim's feet and shows the length of her body. Officer Calhoun identified the photograph during his description of finding the victims' bodies at the crime scene. The appellant complains that this photograph is not relevant to any contested issue during the penalty phase. Although the State argued to the trial court that the photograph was relevant to show the location of the victim's body, the appellant contends that the photograph was unnecessary because officers testified as to the location of the victim's body. Thus, even if relevant, the photograph was more prejudicial than probative and was an appeal to the jury's emotions. The State contends that the photograph was properly admitted in support of the heinous, atrocious, or cruel aggravating circumstance. The State also responds that this issue is waived for failure to object at trial. We conclude that the appellant is not entitled to relief on this issue.

The admission of photographs is generally within the discretion of the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); see also State v. Hall, 8 S.W.3d 593, 602 (Tenn. 1999); Tenn. R. Evid. 401. Photographs should not be admitted solely to inflame the jury and prejudice the defendant. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); Banks, 564 S.W.2d at 950-51. Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. Faulkner, 154 S.W.3d at 67; State v. Vann, 976 S.W.2d 93, 103 (Tenn. 1998); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); see also Tenn. R. Evid. 403. "In this respect, . . . photographs of a murder victim are prejudicial by their very nature." State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005). "However, prejudicial evidence is not per se excluded; indeed, if this were true, all evidence of a crime would be excluded at trial." Faulkner, 154 S.W.3d at 67.

Instead, evidence that is "unfairly prejudicial" is excluded. Id. Evidence is unfairly prejudicial if it has "[a]n undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one.'" Banks, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Committee Comment).

The admissibility of evidence at a capital sentencing hearing is controlled by Tennessee Code Annotated section 39-13-204(c), which allows the admission of any evidence "the court deems relevant to the punishment . . . regardless of its admissibility under the rules of evidence." See Faulkner, 154 S.W.3d at 67; Hall, 8 S.W.3d at 602. In essence, section 39-13-204(c) permits the introduction of any evidence relevant to sentencing in a capital case, subject only "to a defendant's opportunity to rebut any hearsay statements and to constitutional limitations." Hall, 8 S.W.3d at 602. Thus, any evidence relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment. State v. Teague, 897 S.W.2d 248, 250 (Tenn. 1995). Section 39-13-204(c) does not require a complete disregard for the Rules of Evidence, however. The trial court may continue to use the Rules of Evidence to guide its decisions regarding the admissibility of evidence in capital sentencing proceedings. See State v. Sims, 45 S.W.3d 1, 14 (Tenn. 2001).

Turning to the instant case, we note that despite the appellant's claim to the contrary, the record reveals that he did not object to the State's admitting exhibit 9 into evidence. Our review of the sentencing hearing transcript shows that the following exchange occurred:

| [State]: | The next picture is a picture -- it's a long shot showing the location of Ms. Cruchon's body. |
|---|---|
| THE COURT: | Are you objecting to this picture? |
| [Defense]: | Well, there are -- show him the other long shot. |
| [State]: | I don't have another long shot. |
| [Defense]: | I thought you had another – |
| [State]: | No. |

. . . .

[Defense]: Okay. My objection was with respect to the other one that I thought they were going to use, which was cumulative. It is also grisly, but we'll submit it to the Court.

By failing to make a contemporaneous objection, the appellant has waived the issue. See Tenn. R. App. P. 36(a).

In any event, in holding that the photograph was admissible, the trial court stated, "I don't find that it's grisly. There is some blood on the pants and if you look on the walls and the doorway, but I don't find this, at all, grisly. So I am going to allow it." We have reviewed the photograph and agree that it was admissible. The State introduced exhibit 9 in order to illustrate law enforcement officers' descriptions of the crime scene. The photograph was properly admitted as being relevant to background information because it accurately depicts the nature and circumstances of the crimes. See State v. Carter, 114 S.W.3d 895, 903 (Tenn. 2003). The introduction of background information regarding the nature and circumstances of the crime is especially important in cases where the defendant pleads guilty and the jury does not have the benefit of proof normally introduced during the guilt phase of trial. Id. The parties are "entitled to offer evidence relating to the circumstances of the crime so that the sentencing jury will have essential background information 'to ensure that the jury acts from a base of knowledge in sentencing the defendant.'" State v. Adkins, 725 S.W.2d 660, 663 (Tenn. 1987) (quoting State v. Teague, 680 S.W.2d 785, 788 (Tenn. 1984)).

Additionally, because the photograph depicts blood spatter and stains, we conclude that it is relevant to show the serious, physical abuse of Cruchon under aggravating circumstance (i)(5). See Tenn. Code Ann. § 39-13-204(i)(5); see, e.g., Carter, 114 S.W.3d at 903 (photographs depicting victims' bodies at crime scene relevant to prove "heinous, atrocious, or cruel" aggravating circumstance); State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994) (photographs depicting the victim's body, including one of the slash wound to the throat, which was "undeniably gruesome," were relevant and admissible to prove that the killing was "especially heinous, atrocious, or cruel"); State v. McNish, 727 S.W.2d 490, 495 (Tenn. 1987) (photographs of the body of the victim, who was beaten to death, were relevant and admissible to show the heavy, repeated, and vicious blows to the victim and to prove that the killing was "especially heinous, atrocious, or cruel"). In short, our supreme court has repeatedly held that photographs relevant to proving the (i)(5) aggravating circumstance are admissible in the penalty phase. See State v. Morris, 24 S.W.3d 788, 810-11 (Tenn. 2000); State v. Hall, 976 S.W.2d 121, 162 (Tenn. 1998); State v. Smith, 868 S.W.2d 561, 579 (Tenn. 1993); State v. Miller, 771 S.W.2d 401, 403-04 (Tenn. 1989); State v. Porterfield, 746 S.W.2d 441, 449-50 (Tenn. 1988).

Finally, we cannot conclude that the photograph was unfairly prejudicial. The photograph is not gruesome or shocking and corroborates the testimony presented at the sentencing hearing. Thus, even if cumulative, it is admissible. Carter, 114 S.W.3d at 904; Morris, 24 S.W.3d at 811

(appendix) (photograph not inadmissible merely because it is cumulative); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993) (photographs admissible despite introduction of videotape depicting crime scene); State v. Brown, 836 S.W.2d 530, 531 (Tenn. 1992) (photographs admissible despite oral testimony describing injuries). After review of the photograph and the applicable law, we cannot conclude that the trial court abused its discretion by admitting the photograph into evidence.

D. Apprendi/Ring Violation as to (i)(2) Aggravator

Before the sentencing hearing, the State made known that it would use the appellant's three prior convictions for aggravated robbery to establish the existence of the (i)(2) aggravating circumstance, that the appellant had prior convictions for one or more felonies whose statutory elements involved the use of violence to the person. See Tenn. Code Ann. § 39-13-204(i)(2). During the penalty phase, the State introduced the indictments and judgments, showing that the appellant had pled guilty to three counts of aggravated robbery. At the conclusion of the penalty phase, the trial court instructed the jury with respect to both convictions of first degree murder as follows:

> The defendant was previously convicted of one, or more felonies other than the present charge. The statutory elements of which involve the use of violence to the person.
>
> The state is relying upon the crime of aggravated robbery which is a felony. The statutory elements of which involve the use of violence to the person.

The appellant contends that the question of whether the prior offenses involved the use of violence to the person was a question for the jury to resolve beyond a reasonable doubt. Essentially, the appellant complains that the procedure set forth in Sims, 45 S.W.3d at 11-12, in which the trial court considers the underlying facts of the prior offenses to determine whether the elements of the offenses involved the use of violence to the person, violates the dictates of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428 (2002).

Our supreme court rejected this same argument in State v. Cole, 155 S.W.3d 885, 900-05 (Tenn. 2005), cert. denied, ___ U.S. ___, 126 S. Ct. 47 (2005). In doing so, our high court acknowledged that "Apprendi and its progeny preclude judges from finding 'additional facts,' that increase a defendant's sentence beyond the 'statutory maximum,' which is defined as the maximum sentence a judge may impose 'solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.'" Id. at 903 (quoting Blakely v. Washington, 542 U.S. 296, 303, 124 S. Ct. 2531, 2537 (2004)). The court differentiated the principles of Apprendi from the Sims procedure, concluding that "[t]he Sims procedure involves a legal determination, and as such this procedure does not transgress the dictates of Apprendi and its progeny." Id. at 904.

In explaining this conclusion, our supreme court stated,

> The (i)(2) aggravating circumstance requires only that the <u>statutory elements</u> of the prior felony involve the use of violence to the person. The <u>Sims</u> procedure authorizes trial judges merely to examine the facts, record, and evidence <u>underlying</u> the prior conviction to ascertain which "statutory elements" served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence. This legal determination is analogous to the preliminary questions trial judges often are called upon to decide when determining the admissibility of evidence.

<u>Id.</u> (citation omitted). In this regard, it has been recognized that "certain aspects of the character of prior convictions are so basic as to be implicit in the fact of a prior conviction." <u>United States v. Hollingsworth</u>, 414 F.3d 621, 623 (6th Cir. 2005). "[T]he violent nature of a previous offense 'is not a fact that pertains to the commission of the offense for which the defendant is presently charged,' but rather a fact that pertains to the previous offense." <u>Id.</u> (quoting <u>United States v. Burgin</u>, 388 F.3d 177, 186 (6th Cir. 2004)). Although the appellant cites <u>Shepard v. United States</u>, 544 U.S. 13, 125 S. Ct. 1254 (2005), in support of his argument, that holding does not sway this court because the issue in <u>Shepard</u> was not whether the trial court could make findings about prior convictions but rather what sources the trial court could rely on to make such findings. <u>Shepard</u>, 544 U.S. at ___, 125 S. Ct. at 1257 (holding that "a later court determining the character of an admitted [prior felony] is generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented"). Accordingly, the determination of whether the appellant's prior convictions for multiple counts of aggravated robbery were crimes involving violence to the person was squarely within the province of the trial court, and the appellant is not entitled to relief on this issue.

### E. Instruction on Victim Impact Testimony

Next, the appellant asserts that the trial court's victim impact instruction was an undue intrusion into the exclusive province of the jury. In instructing the jury, the trial court provided the following instruction as to victim impact evidence:

> Victim impact evidence. The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim[']s death on the members of the victim[']s immediate family.

You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence.

Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance.

Introduction to this victim impact evidence in no way relieves the state of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt, by evidence independent from the victim impact evidence and find that the aggravating circumstance or circumstances found, outweigh the finding of one or more mitigating circumstance, or circumstances beyond a reasonable doubt.

The appellant contends that there is a reasonable probability that the instruction coerced a finding by the jury that the aggravating circumstances outweighed the mitigating circumstances because to find otherwise would require the jury to ignore the emotional victim impact evidence presented by the prosecution.

The instruction provided to the jury in the present case was recommended by our supreme court in State v. Nesbit, 978 S.W.2d 872, 892 (Tenn. 1998), and was discussed and approved by our supreme court in State v. Reid, 91 S.W.3d 247, 282-83 (Tenn. 2002). See also Cole, 155 S.W.3d at 914 (appendix) (approving the Nesbit victim impact instruction). In Reid, the supreme court specifically noted that any contradiction arising between the instruction and the statute inured to the benefit of the defendant. 91 S.W.3d at 283. Accordingly, the appellant is not entitled to relief on this issue.

### F. Constitutionality of Tennessee's Death Penalty Statutes

The appellant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. Upon review, we conclude that the appellant's specific complaints have been previously rejected by the courts of this state. In light of this fact, we acknowledge that the appellant must raise these issues to preserve them for review by a higher court. We briefly address each challenge made by appellant.

First, the appellant asserts that Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, thereby rendering Tennessee death penalty statutory scheme unconstitutional. Specifically, he argues that the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-13-204(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted, whether viewed singly or collectively, that they fail to provide a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. We note that factor (i)(6) does not pertain to this case as this factor was not relied upon by the State nor found by the jury. Thus, any individual claim with respect to this factor is without merit. See, e.g., State v. Hall, 958 S.W.2d 679, 715 (Tenn. 1997); State v. Brimmer, 876 S.W.2d 75, 86 (Tenn. 1994). Moreover, the appellant's argument has been rejected by our supreme court on numerous occasions. See Vann, 976 S.W.2d at 117-18 (appendix); State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994).

Second, the appellant argues that the imposition of the death penalty in this state is unconstitutional because the death sentence is imposed capriciously and arbitrarily. Specifically, he contends that unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. However, this argument also has been rejected. See State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995). The appellant also contends that the death penalty is imposed in a discriminatory manner based upon race, geography, and gender. Once again, this argument has been rejected. See Id.; Cazes, 875 S.W.2d at 268; State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993). He argues that requiring the jury to agree unanimously to a life verdict violates Mills v. Maryland, 486 U.S. 367, 108 S. Ct. 1860 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S. Ct. 1227 (1990). This argument has been rejected. See Brimmer, 876 S.W.2d at 87; State v. Thompson, 768 S.W.2d 239, 250 (Tenn. 1989). The appellant also contends that there is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances. This argument also has been rejected. See Thompson, 768 S.W.2d at 250-52.

Third, the appellant asserts that the appellate review process in death penalty cases is constitutionally inadequate. Our supreme court has rejected this argument also. See Cazes, 875 S.W.2d at 270-71; State v. Harris, 839 S.W.2d 54, 77 (Tenn. 1992). Moreover, the supreme court has held that "[w]hile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997).

G. Review Pursuant to Tenn. Code Ann. § 39-13-206(c)

Pursuant to Tennessee Code Annotated § 39-13-206(c)(1), we are required to review the application of the death penalty to determine whether

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances;  and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

## 1.  Arbitrariness

Having thoroughly reviewed the record, we find that the sentence of death was not imposed in any arbitrary fashion.

## 2.  Sufficiency of Statutory Aggravating Circumstances Found by Jury

### a.  Prior Violent Felony – the (i)(2) Circumstance

As stated previously, Tennessee Code Annotated section 39-13-204(i)(2) provides that in a capital case, a jury may sentence a defendant to death if the defendant was previously convicted of a felony "whose statutory elements involve the use of violence to the person."  Although not raised by either party, we believe we must address whether the trial court properly determined that the appellant's prior felony convictions for aggravated robbery were convictions that involved the use of violence to the person.

Our supreme court has recognized that some felony offenses, including aggravated robbery, do not necessarily involve the use of violence.  State v. McKinney, 74 S.W.3d 291, 306 (Tenn. 2002).  Specifically, in McKinney, our supreme court acknowledged that, while the large majority of aggravated robberies involve violence,  the offense may also be committed with an "article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon."  Id. at 306 (quoting Tenn. Code Ann. § 39-13-402(a)(1)).  "This statutory provision thus raises the question of whether an offense of aggravated robbery committed in this manner constitutes violence."  Id.

In Sims, the court approved a procedure in which the trial judge, outside the presence of the jury, considers the underlying facts of the prior felony to determine whether the elements of those offenses involved the use of violence to the person. 45 S.W.3d at 11-12. The Tennessee Supreme Court has held that for purposes of determining whether a defendant has a conviction for a prior violent felony involving the use of violence against a person, for purposes of aggravating circumstance (i)(2), "the trial judge must necessarily examine the facts underlying the prior felony" to determine whether it involved violence against a person if that prior violent felony conviction may be committed "with or without proof of violence." Id. at 12. "If the trial court determines that the statutory elements of the prior offense involved the use of violence, the State may introduce evidence that the defendant had previously been convicted of the prior offenses," and the trial court "then would instruct the jury that those convictions involved the use of violence to the person." State v. Powers, 101 S.W.3d 383, 400-01 (Tenn. 2003).

The trial court in this case did not follow the Sims procedure because no jury-out determination was made as to whether the elements of the offenses involved the use of violence to the person. During the penalty phase and in support of this aggravating circumstance, the State introduced the indictments charging the appellant with three counts of aggravated robbery. According to the indictments, the appellant "did unlawfully, knowingly, and violently, by use of a deadly weapon, to-wit: a knife, [a pistol, and a shotgun] obtain . . . a sum of money" from the person of each victim. (Emphasis added.) No testimony rebutted the information provided in the indictments, and the proof revealed that the appellant entered guilty pleas to the charged offenses. Thus, the underlying facts of these offenses were provided to the trial court.

The record reflects that the appellant objected to the trial court's making the legal determination as to whether the appellant's prior convictions involved the use of violence and that the trial court stated, "[T]hat is a legal conclusion that the Judge must make." This ruling and the trial court's instruction to the jury regarding the (i)(2) factor demonstrate that the trial court did conclude that the offenses involved the use of violence to the person, although this determination was not made specifically on the record. Upon review, we conclude that the indictments charging the appellant with aggravated robbery reflect that the offenses involved the use of violence to the person and that the trial court properly instructed the jury as to the (i)(2) aggravating circumstance. The evidence, therefore, supports the jury's finding of the prior violent felony aggravating circumstance as to each murder.

b. Heinous, Atrocious, or Cruel – the (i)(5) Circumstance

The aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(5) applies where the "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." "Torture" has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and

-33-

conscious." State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). "Serious physical abuse beyond that necessary to produce death" has been defined as follows:

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

Odom, 928 S.W.2d at 26 (quoting Black's Law Dictionary 11 (6th ed. 1990)). Proof of either torture or serious physical abuse beyond that necessary to produce death is sufficient to support the aggravator.

### i. Mary Jane Cruchon

The facts in the instant case reveal that the appellant lured Cruchon into the hallway, where he inflicted blow after blow to her head with a claw hammer. Dr. O.C. Smith testified that Cruchon received approximately fourteen blows to the head. She also had bruising on various parts of her body as well as defensive wounds on her hands. The presence of blood in her throat, in the back of her mouth, in her lungs, and in her stomach indicated that the victim did not die immediately. The appellant stated that he first hit Cruchon in the back of the head, and he admitted that he continued to strike her after she fell to the floor. He then proceeded to hit the victim with the hammer, tearing her face open. The appellant testified that the victim moaned during the attack and that he only stopped his assault when Cruchon ceased movement. Forensic evidence supports the conclusion that the attack did not immediately render Cruchon unconscious. See State v. Bane, 57 S.W.3d 411, 426 (Tenn. 2001).

Moreover, the multiple blows to Cruchon's head amounted to excessive, gratuitous violence upon the victim. The evidence supports a finding that Cruchon was subjected to serious, physical abuse beyond that necessary to produce death. See Hall, 8 S.W.3d at 601; State v. Bivens, 967 S.W.2d 821, 825 (Tenn. Crim. App. 1996) ("multiplicity of the wounds beyond that necessary to cause death and the wanton infliction of gratuitous violence" supported application of (i)(5) aggravator). After careful review, we hold that the evidence supports the application of the (i)(5) aggravator as to the murder of Mary Jane Cruchon.

### ii. Franchion Pollack

After beating Cruchon, the appellant returned to the kitchen where Pollack remained.

Nothing in the record indicates that she anticipated his attack or that she overheard his attack on Cruchon. The appellant told Pollack that Cruchon had had an accident, and he and Pollack went into the hallway, where he struck the eighty-nine-year-old in the back of the head twice with the hammer. Pollack did not die immediately from her head injuries and was transported to The Med, where she underwent surgery. She died shortly thereafter from the injuries to her brain. Dr. O.C. Smith testified that one of the wounds to the back of Pollack's head was "probably a severe blow" and that the blow was severe enough to "actually separate fragments of the skull and then to propel those fragments into the brain substance." Because he was unable to determine the order in which the blows were inflicted, the medical examiner conceded that Pollack could have been rendered unconscious by the infliction of the first blow. Although the victim did not die immediately from the injuries, there is no forensic evidence to support a conclusion that the victim was not immediately rendered unconscious. Nevertheless, Officer Calhoun testified that upon checking the victims to determine whether they were deceased, he observed Pollack breathing. He said, "I just happened to look down, she breathed and she looked at me and I tried to talk to her to get some kind of some response from her about what happened, are you okay. She couldn't respond really." Officer Calhoun believed that the victim was conscious.

Initially, we note that we cannot conclude Pollack suffered mental torture as she sat in the kitchen while her friend was brutally killed in the hallway. The evidence does not reflect that Pollack had any indication of the fate of her friend. Moreover, the attack upon Pollack was in no way as brutal as the attack upon Cruchon. Pollack sustained two blows to the back of the head compared to the fourteen sustained by Cruchon. Notwithstanding the disparity in the number of blows inflicted, this fact alone does not render the attack any less heinous, atrocious, or cruel than that inflicted upon Cruchon. While two blows to the head may not, per se, constitute torture or serious physical abuse under the (i)(5) aggravator, the blows can constitute torture, as in the present case, when the victim remains alive, conscious, and in pain as a result of the injuries. Evidence of a severe blow sustained by a conscious victim has been held to be sufficient to establish the heinous, atrocious, or cruel aggravating circumstance. See State v. Barber, 753 S.W.2d 659, 669 (Tenn. 1988). Thus, it was within the jury's discretion to accredit Officer Calhoun's testimony and find that the victim was conscious and capable of feeling extreme physical pain during the crime. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Considering the evidence in the light most favorable to the State, a rational trier of fact could have found that Pollack was conscious and experienced serious physical pain during the crime. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Accordingly, we conclude that the evidence is sufficient to support application of this aggravator with respect to the murder of Franchion Pollack.

c. Murder Committed During Perpetration of Felony – the (i)(7) Circumstance

We conclude that the evidence supports the application of the (i)(7) aggravating circumstance, which requires that "[t]he murder was knowingly committed . . . by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson,

rape, robbery, burglary, [or] theft." Tenn. Code Ann. § 39-13-204(i)(7). As discussed previously, the killings were committed during the appellant's attempt to gain cash or other valuables in order to purchase cocaine. The evidence shows that the appellant removed a television and some money from Pollack's home. This evidence is sufficient to support the jury's finding that the (i)(7) aggravating factor was proven beyond a reasonable doubt.

### d. Victim Over Seventy Years Old – the (i)(14) Circumstance

The aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(14) applies where the victim was seventy years old or older. Testimony during the penalty phase of the trial revealed that Franchion Pollack was eighty-nine years old at the time of the crimes. This testimony was uncontested and supports application of the (i)(14) aggravator with respect to the murder of Franchion Pollack.

### 3. Totality of Aggravating Factors Applied

With respect to the murder of Mary Jane Cruchon, the jury found the presence of three statutory aggravating circumstances, i.e., the appellant has prior convictions for felonies involving the use of violence to the person; the murder was especially heinous, atrocious or cruel; and the murder was committed by the appellant while he had a substantial role in committing or attempting to commit a felony. The appellant has three prior convictions for aggravated robbery, all involving the use of a weapon upon the victim. Thus, the evidence supporting the application of the (i)(2) aggravating circumstance, as to each victim, is overwhelming. See Tenn. Code Ann. § 39-13-204(i)(2). The record also supports the jury's finding that the murder of Mary Jane Cruchon was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, see Tenn. Code Ann. § 39-13-204(i)(5), and that the murder in this case was knowingly committed by the appellant while he had a substantial role in committing or attempting to commit robbery, see Tenn. Code Ann. § 39-13- 204(i)(7). We further hold that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

With respect to the murder of Franchion Pollack, the jury found the presence of four statutory aggravating circumstances, i.e., the appellant has prior convictions for felonies involving the use of violence to the person; the murder was especially heinous, atrocious, or cruel; the murder was committed by the appellant while he had a substantial role in committing or attempting to commit a felony; and the victim was seventy years old or older. The appellant has three prior convictions for aggravated robbery, all involving the use of a weapon upon the victim. Thus, the evidence supporting the application of the (i)(2) aggravating circumstance is overwhelming. See Tenn. Code Ann. § 39-13-204(i)(2). The record also supports the jury's finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary

to produce death, see Tenn. Code Ann. § 39-13-204(i)(5), that the murder was knowingly committed by the appellant while he had a substantial role in committing or attempting to commit robbery, see Tenn. Code Ann. § 39-13- 204(i)(7), and that the victim was seventy years of age or older, see Tenn. Code Ann. § 39-13-204(i)(14). We further hold that the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

## 4. Proportionality

This court is required by Tennessee Code Annotated section 39-13- 206(c)(1)(D) and under the mandates of Bland, 958 S.W.2d at 661-74, to consider whether the appellant's sentences of death are disproportionate to the penalty imposed in similar cases. See State v. Godsey, 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review "is designed to identify aberrant, arbitrary, or capricious sentencing." State v. Stout, 46 S.W.3d 689, 706 (Tenn. 2001). It does this by determining whether the death penalty in a given case is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 43, 104 S. Ct. 871, 876 (1984)). If a case is "'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed,' then the sentence is disproportionate." Stout, 46 S.W.3d at 706 (quoting Bland, 958 S.W.2d at 668).

In conducting our proportionality review, this court must compare the present case with cases involving similar defendants and similar crimes. See id.; see also Terry v. State, 46 S.W.3d 147, 163-64 (Tenn. 2001). We select only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. See State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000); see also Godsey, 60 S.W.3d at 783.

We begin with the presumption that the sentence of death is proportionate with the crime of first degree murder. See Terry, 46 S.W.3d at 163 (citing Hall, 958 S.W.2d at 699). This presumption applies only if the sentencing procedures focus discretion on the ""particularized nature of the crime and the particularized characteristics of the individual defendant."" Id. (quoting McCleskey v. Kemp, 481 U.S. 279, 308, 107 S. Ct. 1756, 1775 (1987) (quoting Gregg v. Georgia, 428 U.S. 153, 206, 96 S. Ct. 2909, 2940-41 (1976))).

Applying this approach, in comparing this case to other cases in which the defendants were convicted of the same or similar crimes, this court looks "at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved." See id. at 164. Regarding the circumstances of the crime itself, numerous factors are considered, including the following:

(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of provocation; (7) the absence or presence of premeditation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims.

Stout, 46 S.W.3d at 706; see also Terry, 46 S.W.3d at 164. Contemplated within the review are numerous other factors, including the defendant's "(1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." Stout, 46 S.W.3d at 706; Terry, 46 S.W.3d at 164. In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." Terry, 46 S.W.3d at 164. Thus, our function is not "to limit our comparison to those cases where a defendant's death sentence 'is perfectly symmetrical,' but only to 'identify and to invalidate the aberrant death sentence.'" Id. (quoting Bland, 958 S.W.2d at 665).

Turning to the instant case, the appellant has prior convictions for aggravated robbery. The death sentence has been upheld based on the sole aggravating circumstance of a prior violent felony conviction. See, e.g., McKinney, 74 S.W.3d at 291 (prior conviction for aggravated robbery as adult and aggravated assault as juvenile); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (prior convictions for attempted especially aggravated robbery and attempted first degree murder); State v. Keough, 18 S.W.3d 175 (Tenn. 2000) (prior convictions for assault to commit voluntary manslaughter and manslaughter); State v. Smith, 993 S.W.2d 6 (Tenn. 1999) (prior convictions for robbery and first degree murder); State v. Boyd, 959 S.W.2d 557 (Tenn. 1998) (prior conviction for second degree murder). The prior violent felony factor is an aggravating circumstance that the courts of this state have described as "'more qualitatively persuasive and objectively reliable than others.'" McKinney, 74 S.W.3d at 313 (quoting State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993)).

The death sentence has also been upheld under facts similar to and under application of statutory aggravating circumstances found in the instant case. State v. Leach, 148 S.W.3d 42 (Tenn. 2004) (defendant brutally beat, stabbed, and strangled two elderly women, one victim was raped; murders were committed during a robbery at victim's home; death sentence upheld based upon (i)(2), (i)(5), (i)(7), and (i)(14) (only to one victim)); State v. Mann, 959 S.W.2d 503 (Tenn. 1997) (defendant raped and murdered sixty-two-year-old widow during burglary, death sentence upheld based upon (i)(5) and (i)(7) aggravating circumstances); State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (defendant murdered seventy-nine-year-old widow, death sentence upheld based upon (i)(5) and (i)(6) aggravators); Smith, 893 S.W.2d at 908 (defendant raped and murdered elderly widow, death sentence upheld based upon (i)(2), (i)(5), and (i)(7) aggravators); Cazes, 875 S.W.2d at 253 (defendant raped and murdered elderly woman, death sentence upheld based upon (i)(2), (i)(5), and (i)(7) aggravators); Barber, 753 S.W.2d at 659 (defendant murdered elderly woman, death sentence upheld based upon (i)(5) and (i)(7) aggravators); State v. McNish, 727 S.W.2d 490 (Tenn. 1987)

(defendant murdered seventy-two-year-old widow, death sentence upheld based upon (i)(5) aggravator); State v. Harbison, 704 S.W.2d 314 (Tenn. 1986) (defendant murdered sixty-two-year-old woman, death sentence upheld based upon (i)(7) aggravator); and State v. Cone, 665 S.W.2d 87 (Tenn. 1984) (defendant murdered elderly couple, death sentence upheld based upon (i)(2), (i)(5), and (i)(6) aggravators).  Our review of these cases reveals that the sentences of death imposed upon the appellant is proportionate to the penalty imposed in similar cases.

### III.  Conclusion

In accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this case and conclude that the sentences of death were not imposed in any arbitrary fashion, that the evidence supports the jury's finding of the statutory aggravating circumstances, and that the evidence supports the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt.  See Tenn. Code Ann. § 39-13-206(c)(1)(A)-(C).  A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentences of death are neither excessive nor disproportionate to the penalty imposed in similar cases.  See Tenn. Code Ann. § 39-13-206(c)(1)(D).  Moreover, we discern no errors that require a reversal in this case and affirm the sentences of death imposed by the jury.[1]

_____

NORMA McGEE OGLE, JUDGE

_____

[1] We note that the record reflects that the appellant committed the crimes in this case while he was on parole for prior felony offenses.  Tennessee Rule of Criminal Procedure 32(c)(3)(A) "requires that the sentence imposed for [a felony] offense committed while on parole run consecutively to the sentence for the felony for which the offender was on parole."  Hogan v. Mills, 168 S.W.3d 753, 755-56 (Tenn. 2005); see also Tenn. Code Ann. § 40-28-123(a).  This is true "whether the judgment explicitly so orders or not."  Tenn. R. Crim. P. 32(c)(3).